UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

─────────────────────────────

DEJUAN HAYWOOD HAGGINS,                          Civil No. 10-2554 (DWF/LIB)

      Plaintiff,

    v.                                              **REPORT AND RECOMMENDATION**

SHERBURNE COUNTY,
SHERBURNE COUNTY SHERIFF, and
STEPHEN PEDERSEN,

      Defendants.

─────────────────────────────

     Dejuan Haywood Haggins, Minnesota Correctional Facility – Oak Park Heights, 5329 Osgood Avenue North, Stillwater, Minnesota, 55082, Plaintiff, pro se.

     Jon K. Iverson and Stephanie A. Angolkar, Iverson Reuvers, 9321 Ensign Avenue South, Bloomington, Minnesota, 55438, for Defendants Sherburne County and Sherburne County Sheriff.

     William J. Everett and Daniel P. Kurtz, Everett & VanderWiel, P.L.L.P., 100 Center Drive, Buffalo, Minnesota, 55313, for Defendant Stephen Pedersen.

─────────────────────────────────────────────

LEO I. BRISBOIS, United States Magistrate Judge

     The above-named Plaintiff, Dejuan Haywood Haggins, is a Minnesota state prison inmate.  He commenced this action by filing a complaint seeking relief under 42 U.S.C. § 1983 for alleged violations of his federal constitutional rights.  (Docket No. 1.)  Defendants Sherburne County and Sherburne County Sheriff have filed a motion seeking to have Plaintiff's claims against them dismissed on summary judgment pursuant to Fed. R. Civ. P. 56, and seeking an order that would prohibit Plaintiff from filing any future lawsuits in this District without first obtaining a judge's pre-approval.  (Docket No. 18.)  Defendant Stephen Pedersen, (hereafter "Pedersen"), has filed a separate motion for summary judgment

seeking dismissal of all of Plaintiff's claims against him.  (Docket No. 27.)  Plaintiff has filed

several documents in opposition to Defendants' motions, (Docket Nos. 38-42, 48, 49, and

51), and Defendants have replied to Plaintiff's opposition, (Docket Nos. 43-46).

Defendants' motions have been referred to this Court for a Report and

Recommendation under 28 U.S.C. § 636 and Local Rule 72.1.  For the reasons discussed

below, the Court will recommend that Defendants' motions be denied.

## I. BACKGROUND

Plaintiff has an extensive criminal record that includes charges of theft, disorderly

conduct, giving false information to police, assault, terroristic threats, and aggravated

robbery.  (Affidavit of Daniel P. Kurtz, [Docket No. 31], ["Kurtz Aff."], Exh. B, Exh. C.)

Defendants have presented evidence showing that in December 2003, Plaintiff assaulted

a state court judge.  He became upset during a state court criminal proceeding, ran up to

the bench, and physically attacked the judge.  (Id., Exh. E.)  Plaintiff has admitted that he

did attack a judge in court.  (Transcript of Deposition of Dejuan Haggins, [hereafter "Depo"],

pp. 77-78.[1])  Plaintiff also admits that he has engaged in fistfights with jailers, and

"assaulted some guards."  (Depo., p. 78, p. 106.)

In June 2007, a federal criminal complaint was filed against Plaintiff in this District,

charging him with three counts of armed bank robbery.  (United States v. Haggins, Crim.

No. 07-239 (JNE/FLN); Affidavit of Stephanie A. Angolkar, [Docket No. 22], ["Angolkar

Aff."], Exh. A.))   While awaiting trial on those charges, Plaintiff was detained at the

---

[1] Plaintiff was deposed on July 7, 2011.  A transcript of his deposition is attached
to the Affidavit of Stephanie A. Angolkar, [Docket No. 22], as "Exhibit C."  The pages of the
original transcript of the deposition are numbered in the upper right hand corner.  Citations
to the transcript of Plaintiff's deposition will be identified as "Depo, p. __."

Sherburne County Jail in Elk River, Minnesota.  He was held there from June 26, 2007, to July 12, 2007, and from August 1, 2007, to September 12, 2007.  (Affidavit of Angela Knutson, [Docket No. 21], ["Knutson Aff."], p. 1, ¶ 2.)   During that time, Plaintiff accumulated 19 "problem reports."  (Id., Exhs. D-J.)  On one occasion, just three days after arriving at the Sherburne County Jail, Plaintiff hurled a chair at a jail staff member.  (Id., Exh. H.)  Plaintiff acknowledges that he has mental health problems that have been diagnosed with schizophrenia, (Depo., p. 64), and he has described himself as a "Tazmanian Devil" while he was at the Sherburne County Jail.  (Depo., p. 95.)  As a result of Plaintiff's persistent misconduct at the Sherburne County Jail, he was placed in a "special housing" unit for part of his stay there.

While Plaintiff was in the special housing unit, he made several inappropriate sexual comments to female jail personnel who were passing out medications.  (Affidavit of Stephen Pedersen, [Docket No. 32], ["Pedersen Aff."], p. 2, ¶ 5.)[2]  To avoid that problem, Defendant Pedersen had to change the Jail's practice for distributing medications in the special housing unit.  (Id., ¶ 6.)

During the evening of August 30, 2007, Plaintiff was exercising in his cell in the special housing unit.  A female corrections officer named Abrahamson was passing out medications.  While Abrahamson was near Plaintiff's cell, he had conversation with her. He told Abrahamson that he could "do her better than her boyfriend."  (Knutson Aff., Exh. K, pp. 87, 93; see also, Depo., pp. 13-14; Plaintiff's "Response/Sworn Declaration In Full

---

[2]  Plaintiff acknowledges telling a nurse that "she looked nice [and] we could have kids together."  (Depo., p. 17.)  However, Plaintiff has disputed Pedersen's assertion that he made inappropriate comments on multiple occasions.

Opposition To Defendant/Offender Stephen Pedersen's Unwarranted Motion For Summary Judgment," [Docket No. 39], ["Haggins Resp/Decl."], p. 6.)   According to Plaintiff, Abrahamson was offended by his remark, and responded by telling him "Steve's going to zap your ass."  (Depo., p. 15.)   Abrahamson then reported the incident to Defendant Pedersen, stating that "Inmate Haggins told me he can do me better than my boyfriend can." (Knutson Aff., Exh. K, p. 93; Pedersen Aff., p. 2, ¶ 8.)

Sexual harassment is considered to be a "serious violation" of the Sherburne County Jail rules.  (Pedersen Aff., p. 2, ¶ 9.)  Pedersen was aware of Plaintiff's previous sexual harassment of female jail personnel, and after hearing about Plaintiff's crude remark to Abrahamson, Pedersen determined that Plaintiff should be moved from the special housing unit to another cell in the "booking area." (Id., p. 3, ¶ 10.)  Pedersen believed that moving Plaintiff to the booking area would protect Abrahamson from further harassment, and allow Plaintiff's behavior to be "better monitored and controlled."  (Id., ¶s 10-12.)

Pedersen knew that Plaintiff had a history of violent defiance, so he called on six other jail personnel to help him move Plaintiff into the booking area cell.  (Id., ¶ 13.)  He determined that the safest way to move Plaintiff would be to place him in handcuffs. Therefore, Pedersen and his fellow officers approached Plaintiff's cell, and yelled at him through the locked door.   Pedersen told Plaintiff to get down on the ground so the handcuffs could be applied.  (Id., ¶s 14-17.)

Plaintiff was lying on the bed in his cell, wearing just his boxer shorts, when he heard Pedersen's command to get down on the ground.  (Depo., p. 20)  According to Plaintiff, Pedersen also said, "'Open Haggins' fucking cell.  He's getting zapped.'" (Id. pp. 20, 22; Haggins Resp/Decl., p. 7.)  Pedersen's affidavit neither confirms nor denies that he made

such a statement.  Plaintiff failed to promptly comply with Pedersen's initial command to get down on the ground, so Pedersen repeated the command.  However, Plaintiff still did not promptly comply, so Pedersen activated his Taser device.  (Pedersen Aff., pp. 3-4, ¶ 17.)

The record does not clearly show exactly how much time passed between the moment when Pedersen first told Plaintiff to lie on the ground, and the moment when he activated the Taser.  However, nothing in the record suggests that more than a few seconds elapsed between Pedersen's first command, and the activation of the Taser.

When the Taser was activated, a video camera mounted on the device began to record the ensuing events.  (Defendant Pedersen's Memorandum Of Law In Support Of Summary Judgment, [Docket No. 24], p. 6.)  The resulting video has been transferred to a compact disc that is included in the present record.  (Kurtz Aff., Exh. I; Angolkar Aff., Exh. T.)  The video recording is in black and white, and it is grainy and blurry.  The quality of the visual images is very poor.  The camera also recorded the sounds that accompanied the video images, including discernible voices.  The spoken words that were recorded are not easily understood.  Pedersen has furnished a purported transcript of the audio recording made by the camera mounted on the Taser.  (Defendant Pedersen's Memorandum Of Law In Support Of Summary Judgment, [Docket No. 29], p. 7.)  Although that transcript has not been certified, it does appear to be a fairly accurate rendition of the verbal exchange that was captured by the camera.

The video and transcript reflect that after the Taser was activated, Pedersen quickly told Plaintiff two more times to lie on the ground.  Plaintiff indicated that he wanted to put on some clothes.  At that point, someone ordered that the door to Plaintiff's cell should be

opened.  The cell door apparently was operated by means of some type of remote control, and it did not open immediately.  While Pedersen and his fellow officers waited for the door to open, Pedersen told Plaintiff four more times, in very rapid succession, to lie on the ground.  Plaintiff continued to indicate that he was trying to get dressed.

When the cell door opened, Plaintiff was standing in the cell with only his pants on, facing the door.  The Court cannot discern anything in the video that suggests Plaintiff was acting aggressively when the door opened.  He appears to just be standing in his cell.  It appears to the Court that as soon as the door opened, Plaintiff began to turn away from the door, and Pedersen immediately fired the Taser.  Two small darts shot from the Taser struck Plaintiff on the left side of his bare back, and he received a powerful electric shock that immediately knocked him to the ground.  Plaintiff screamed, and later said "[i]t felt like I got struck by lightening."  (Depo., p. 34.)

Approximately 24 seconds elapsed between the moment when Pedersen activated the Taser and the moment when he fired the Taser darts into Plaintiff's back.  During that 24-second period of time, Pedersen told Plaintiff six times to lie on the ground.  Pedersen had given the same command twice before the Taser was activated, so altogether he told Plaintiff eight times to lie down on the ground.  (Pedersen Aff., p. 4, ¶ 20.)  After the eighth command, Plaintiff was still standing, so Pedersen used the Taser on him.  (Id.)

Plaintiff heard Pedersen telling him to lie on the ground.  (Depo., pp. 23-24; Haggins Resp/Decl., p. 8.)  He also knew that Pedersen had a Taser and was preparing to use it.  (Depo., pp. 23-24; Haggins Resp/Decl., p. 8.)  Because of Plaintiff's frequent encounters with law enforcement officials in the past, he knew what the jail staff wanted him to do as they prepared to put the handcuffs on him – i.e., "they want you to put your arms out and

lay on the ground." (Depo., p. 29.)  However, based on the video evidence and Plaintiff's own statements, it appears that Plaintiff was more concerned about getting dressed than complying with Pedersen's command.   Plaintiff has explained that "I don't know why my door had yet to open, so I took a few seconds to put my pants on."  (Haggins Resp/Decl. p. 8.) However, the video shows that Plaintiff took more than "a few seconds" to put on his pants.  He dawdled for at least 24 seconds, and Pedersen was yelling at him to lie on the ground during that entire time.

Pedersen contends that Plaintiff "refused" to get down on the ground, but he acknowledges hearing Plaintiff "a few times saying something about putting his clothes on." (Pedersen Decl., p. 4, ¶ 18.)  Plaintiff contends that he was intending to lie down when Pedersen was yelling at him, but Pedersen fired the Taser before he actually did lie down. (Id., pp. 32-34.)  According to Plaintiff:

> "Def. Pedersen claims I 'refused' to get on the ground [but that] is false.  I did not 'refuse' anything, I simply attempted to get fully dressed....
>
> I did not 'refuse' to do anything.  I was not dressed.  The situation was not any violent or threatening incident, and Def. Pedersen was outside of a locked solid-door cell.  I could have been allowed to put my shirt and pants on."

("Declaration In Opposition Of Defendant Pedersen's False Affidavit," [Docket No. 41], ["Haggins Decl. II"], 2, ¶ 8; p. 3, ¶ 10.)

The video recording of the Taser incident shows that after Plaintiff was hit with the Taser darts and fell to the ground, he was quickly surrounded by Pedersen and his fellow officers.  The darts were removed from Plaintiff's back, he was placed in handcuffs, and he was then hoisted to his feet.  (Plaintiff was screaming incoherently during this time.)  While being supported by correctional officers, Plaintiff was escorted down a hallway.  (Pedersen

Decl., p. 4, ¶s 22-23.)  At one point, the procession stopped, and someone dabbed some blood away from Plaintiff's dart wounds, and then covered the wounds with a band-aid. Thereafter, Plaintiff was taken to his new cell in the booking area.

Plaintiff claims that sometime shortly after he was placed in his new cell, he saw Pedersen talking to some other correctional officers.  Pedersen allegedly pretended to blow on a Taser "Dirty Hairy [sic] style," and jokingly said "'the nigger zapper strikes again.'" (Haggins Resp/Decl., p. 9; Haggins Decl. II, p. 3, ¶ 12; Depo., pp. 39-42.)  Pedersen flatly denies those allegations.  (Pedersen Decl., p. 5, ¶ 25.)

Plaintiff alleges that he was left shirtless in his new cell overnight.  He complained about being cold during that time, but his complaints allegedly were ignored until the next morning.  (Depo. pp. 39-43.)  Plaintiff has further alleged that at some point --

> "I also asked Health Services for help because I began to have small seizures.  I began to wake up having seizures.  And I would go to sleep having seizures.  And my heart began having – my heart, I began having an irregular heartbeat."

(Depo., p. 44.)  However, Plaintiff does not believe that he received any treatment for those symptoms while he was at the Sherburne County Jail.  (Id., p. 46.)  Plaintiff claims that he continues to suffer from seizures, heart palpitations, and other symptoms allegedly precipitated by the Taser incident.  However, with the exception of his initial request for help from Health Services, which occurred shortly after the Taser incident, Plaintiff has not actively pursued other medical care for his alleged symptoms.  Plaintiff has explained that he "practice[s] holistic, all-natural medicine... African medicine... natural healings... fruits, vegetables... teas... herbs, spices... ginkgo biloba... [t]hings of that nature."  (Depo., p. 46.) He intends to defer any further medical treatment for "any ill-effects" from the Taser incident

until after he gets out of prison.  He is contemplating a trip to China Town in New York City to seek treatment from some Chinese doctors who use "herbal medicines and whatnot." (Depo., p. 47.)

## II.  PLAINTIFF'S CLAIMS

Plaintiff is attempting to sue Defendant Pedersen under 42 U.S.C. § 1983 for allegedly violating his constitutional rights under the Eighth and Fourteenth Amendments. Plaintiff is also attempting to bring a Minnesota state law tort claim against Defendant Pedersen for assault and battery.

It appears that Plaintiff originally intended to bring federal civil rights claims against the other two Defendants – Sherburne County and Sherburne County Sheriff.  However, if that was once Plaintiff's intent, it is now clear that he is not attempting to maintain any § 1983 civil rights claim against those other two Defendants.  Plaintiff has plainly stated "I hereby drop my Monell claim."  (Plaintiff's "Memorandum of Law and Declaration in Full Opposition [etc.]," [Docket No. 38], p. 5, [emphasis in the original].)[3]

Plaintiff has also plainly stated that he is voluntarily dismissing all of his claims against Defendant Sherburne County Sheriff.  (Id. ["I hereby drop Defendant 'Sherburne County Sheriff' from this case"] [emphasis in the original].)  The Court will therefore recommend that Defendant Sherburne County Sheriff be summarily dismissed from this action.

---

[3]  A Monell claim is a § 1983 claim brought against a municipality that has adopted some policy, custom or practice that allegedly caused a violation of the claimant's constitutional rights.  See Davison v. City of Minneapolis, Minn., 490 F.3d 648, 659 (8th Cir. 2007) (city "may be held liable under section 1983... if one of its customs or policies caused the violation of" the plaintiff's constitutional rights"), citing Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 690-91 (1978).

Although Plaintiff has elected to "drop" his § 1983 <u>Monell</u> claims against Defendant Sherburne County, he has also made it clear that he is still attempting to pursue a claim against Sherburne County based on "respondeat superior." (<u>Id.</u>)  The doctrine of respondeat superior is not applicable to § 1983 claims, (<u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989)), but under Minnesota law, Sherburne County could be held vicariously liable for any state law tort claims committed by its employees, under the doctrine of respondeat superior.  <u>See</u> <u>Watson by Hanson v. Metropolitan Transit Com'n</u>, 553 N.W.2d 406, 414 (Minn. 1996) ("[p]olitical subdivisions... may be liable for the torts of their officers, employees, or agents acting within the scope of their employment under the doctrine of respondeat superior").  It is therefore legally apropos for Plaintiff to forego his <u>Monell</u> claims against Sherburne County, while continuing to claim that "Sherburne County is liable for the torts of Pedersen [i.e., the alleged assault and battery] under the doctrine of respondeat superior."  (Plaintiff's "Memorandum of Law and Declaration in Full Opposition [etc.]," [Docket No. 38], p. 5.)

## III.  STANDARD OF REVIEW

Summary Judgment is appropriate only when the evidence shows that there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); <u>Smutka v. City of Hutchinson</u>, 451 F.3d 522, 526 (8th Cir. 2006).  A disputed fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

The moving party bears the burden of bringing forward sufficient admissible evidence to establish that there are no genuine issues of material fact and that the movant

is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The evidence must be viewed in the light most favorable to the nonmoving party, and the nonmoving party must be given the benefit of all reasonable inferences to be drawn from the underlying facts in the record.  Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp., 950 F.2d 566, 569 (8th Cir. 1991).  However, the nonmoving party may not rest on mere allegations or denials in its pleadings, but must set forth specific admissible evidence-based facts showing the existence of a genuine issue.  Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).  "Naked assertions, unsubstantiated by the record," made in rebuttal do not amount to sufficient evidence to preclude summary judgment.  Dutton v. University Healthcare Sys., L.L.C., 136 Fed. Appx. 596 (5th Cir. 2005) (unpublished decision).   "A properly supported motion for summary judgment is not defeated by self-serving affidavits."  Frevert v. Ford Motor Co., 614 F.3d 466, 473 (8th Cir. 2010) (quoting Bacon v. Hennepin Cnty Med. Ctr., 550 F.3d 711,716 (8th Cir. 2008)). "Rather, the plaintiff must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor."  Id. at 473-74.

The movant is entitled to summary judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp., 477 U.S. at 322.  No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id. at 323.

## IV.  DISCUSSION

A.  Plaintiff's § 1983 Claims Against Defendant Pedersen

Plaintiff's first and foremost claim in this case is that Pedersen violated his constitutional rights by Tasering him while he was confined in his cell at the Sherburne County Jail. This claim purportedly is based on the Eighth and Fourteenth Amendments to the Constitution. However, Plaintiff was not serving a prison sentence when he was Tasered, so the Eighth Amendment was not applicable to him at that time. Ingraham v. Wright, 430 U.S. 651, 671 n. 40 (1977) ("the State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law"). At the time of the Tasering, Plaintiff was being held at the Sherburne County Jail as a federal pre-trial detainee.[4] Therefore, Plaintiff was not protected by the Eight Amendment at the time of the Tasering, but rather the conditions of his confinement were governed by the due process clause of the Fourteenth Amendment. Id. ("[w]here the State seeks to impose punishment without... an adjudication [of guilt], the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment"). See also Graham v. Connor, 490 U.S. 386, 395, n. 10 (1989) ("[i]t is clear... that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment), citing Bell v. Wolfish, 441 U.S. 520, 535-39 (1979).

As a practical matter, however, it makes little (if any) difference whether Plaintiff's claims are based on the Eighth Amendment or the Fourteenth Amendment. "The Supreme

---

[4] As previously noted, at the time of the Tasering incident, Plaintiff was being held on bank robbery charges pending against him in United States v. Haggins, Crim. No. 07-239 (JNE/FLN). According to the docket sheet in that case, Plaintiff did not enter a guilty plea until February 2008, and he was not sentenced until May 2008. Thus, it plainly appears that Plaintiff was only a pre-trial detainee, and he was not yet serving a prison sentence, when he was Tasered in August 2007.

Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." Spencer v. Knapheide Truck Equipment Co., 183 F.3d 902, 906 (8th Cir. 1999), cert. denied, 528 U.S. 1157 (2000), quoting City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239, 244 (1983). For this reason, the Eighth Circuit Court of Appeals has consistently applied Eighth Amendment standards to § 1983 claims brought by jail inmates complaining about mistreatment during pre-trial detention. See e.g., Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994) (legal standard applied to pre-trial detainee's Fourteenth Amendment conditions-of-confinement claim is "identical" to the legal standard applied to a convicted inmate's Eighth Amendment conditions-of-confinement claim); Vaughn v. Greene County, Ark., 438 F.3d 845, 850 (8th Cir. 2006) ("[a]lthough this court has yet to establish a clear standard for pretrial detainees... we repeatedly have applied the same 'deliberate indifference' standard as is applied to Eighth Amendment claims made by convicted inmates"); Crow v. Montgomery, 403 F.3d 598, 601 (8th Cir. 2005) ("because, '[u]nder the Fourteenth Amendment, pretrial detainees are entitled to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment,' we apply the identical deliberate-indifference standard as that applied to conditions-of-confinement claims made by convicts") (quoting Owens v. Scott County Jail, 328 F.3d 1026, 1027 (8th Cir. 2003), and Revere, supra).[5]

---

[5] See also Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996) ("Claims involving the mistreatment of... pretrial detainees in custody are governed by the Fourteenth Amendment's Due Process Clause instead of the Eighth Amendment's Cruel and Unusual Punishment Clause, which applies to such claims by convicted prisoners.... However, the applicable standard is the same, so decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees.") (citations omitted).

Federal courts commonly apply Eighth Amendment standards when analyzing § 1983 excessive force claims brought by pretrial detainees against their jailers. <u>See</u> <u>Forrest v. Prine</u>, 620 F.3d 739, 744 (7th Cir. 2010) ("[w]e... borrow Eighth Amendment standards to analyze" a pre-trial detainee's "Fourteenth Amendment section 1983 claim" for excessive use of force by jail employees); <u>Skelly v. Okaloosa County Bd. of County Com'rs</u>, No. 11-11969 (11th Cir. 2012), 2012 WL 335625 (unpublished opinion) at *4, n. 4 ("[b]ecause the applicable standard is the same for both Eighth and Fourteenth Amendment excessive force claims, courts apply Eighth Amendment caselaw to cases involving pretrial detainees").

In <u>Hickey v. Reeder</u>, 12 F.3d 754 (8th Cir. 1993), the Eighth Circuit Court of Appeals considered a § 1983 civil rights claim brought by a plaintiff who had been shot with a "stun gun" while confined at a county jail. The Court's analysis of the plaintiff's claim was guided by the Supreme Court's Eighth Amendment discussions in <u>Hudson v. McMillian</u>, 503 U.S. 1 (1992), and <u>Whitley v. Albers</u>, 475 U.S. 312 (1986). The Court explained that:

"In reviewing Eighth Amendment claims, we extend wide ranging deference to the judgment and policies of the prison officials who must maintain internal order and discipline in the prisons and who must often make snap decisions in volatile and dangerous situations.... It is obdurate, wanton or intentional inflictions of unnecessary pain, not mere inadvertence or good faith mistakes as to the amount of force reasonably called for, which violate the Eighth Amendment.... Our deference, however, does not insulate actions taken in bad faith or actions that amount to a wanton infliction of pain for no legitimate reason.....

Whether pain is wantonly and unnecessarily inflicted depends, at least in part, on whether force could have plausibly been thought to be necessary to maintain order in the institution and to maintain the safety of the prison personnel or inmates.... Other relevant factors include: the objective need for force; the relationship between the need for force and the force used; the threat to others reasonably perceived by the officers; efforts to temper the severity of the force used; and the extent of pain or injury inflicted...."

12 F.3d at 758 (citations to Hudson and Whitley omitted).

In a more recent case, the Eighth Circuit summarized the applicable standard of review for an inmate's excessive force claim as follows:

> "[O]fficers may reasonably use force in a good-faith effort to maintain or restore discipline but may not use it maliciously or sadistically to cause harm....  In evaluating whether the force was reasonable and in good faith, courts may consider the need for applying force, the relationship between that need and the amount of force utilized, the threat the responsible officials reasonably perceived, any efforts used to diminish the severity of a forceful response, and the extent of the injury inflicted."

Walker v. Bowersox, 526 F.3d 1186, 1188 (8th Cir. 2008) (citation omitted).

As the Seventh Circuit Court of Appeals very recently explained:

> "When jailers are accused of using excessive force, the core inquiry is 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'... Several factors are relevant to this determination, including the need for force, the amount applied, the threat a guard reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury caused to the prisoner."

Carr v. Beth, Nos. 11-2050, 11-2051 (7th Cir. Mar.7, 2012) (unpublished opinion), 2012 WL 719695 at *2, quoting Hudson, 503 U.S. at 7.  See also Valencia v. Wiggins, 981 F.2d 1440, 1446 (5th Cir.) ("when a court is called upon to examine the amount of force used on a pretrial detainee[ ] for the purpose of institutional security, the appropriate analysis is that announced in Whitley and Hudson:  whether the measure taken inflicted unnecessary and wanton pain and suffering depends on 'whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm'"), cert denied, 509 U.S. 905 (1993).

While reviewing the evidence of record, the Court has remained mindful of the broad discretion that must be accorded to jail personnel.  They often have to make difficult

decisions about how to handle intractable and unpredictable prisoners.  As the Seventh

Circuit Court of Appeals has observed:

> "Jails are dangerous places, and it is without rational dispute that security officials are justified in maintaining decorum and discipline among inmates to minimize risks to themselves and other prisoners.... [Citations omitted.]  We have previously discussed how important it is that prisoners follow orders:
>
> > 'Orders given must be obeyed.  Inmates cannot be permitted to decide which orders they will obey, and when they will obey them....  Inmates are and must be required to obey orders.  When an inmate refuse[s] to obey a proper order, he is attempting to assert his authority over a portion of the institution and its officials.  Such refusal and denial of authority places the staff and other inmates in danger.'"

Lewis v. Downey, 581 F.3d 467, 476 (7th Cir. 2009), cert. denied, 130 S.Ct. 1936 (2010),

quoting Soto v. Dickey, 744 F.2d 1260, 1267 (7th Cir. 1984), cert. denied, 470 U.S. 1085

(1985).  The Court also pointed out in Lewis that --

> "In many circumstances – often when faced with aggression, disruption, or physical threat – compelling compliance with an order is a valid penological justification for use of a Taser.  See Hickey, 12 F.3d at 759 (recognizing that prison officials "may compel compliance with legitimate prison regulations" through the use of summary physical force).  But such justification does not necessarily exist every time an inmate is slow to comply with an order."

581 F.3d at 477, citing Treats v. Morgan, 308 F.3d 868, 873 (8th Cir. 2002) ("Not every

instance of inmate resistance justifies the use of force....").

With all of these teachings in mind, the Court has considered whether Plaintiff's

excessive force claim against Defendant Pedersen should be dismissed on summary

judgment.  Looking at all the evidence in the record at this time, and viewing that evidence

in a light most favorable to Plaintiff, the Court cannot conclude that Plaintiff's claim is

necessarily unsustainable.

The Court initially notes that Plaintiff was alone in a locked cell at all times leading up to the Tasering.  It appears that Plaintiff was acting rudely and obnoxiously prior to the Tasering, but there is no evidence suggesting that he was acting violently or aggressively, or in a manner that posed any obvious danger to himself or anyone else.  When Pedersen and his staff approached Plaintiff's cell, they were not confronting a then belligerent inmate who was actively threatening to harm them or anyone else.  To the contrary, it appears that Plaintiff was just lying on his bunk.  See Lewis, 581 F.3d at 477 (noting that "[i]n cases upholding the use of Taser guns, the victims have been violent, aggressive, confrontational, unruly, or presented an immediate risk of danger to themselves or others").  At worst, it appears that Plaintiff was simply uncooperative.

The absence of imminent danger does not automatically make the use of force unconstitutional, because correctional officials can properly use force preemptively to maintain security.  See Whitley, 475 U.S. at 322 (the deference afforded to prison guards applies not only to measures taken in response to actual imminent danger, but also to "prophylactic or preventive measures," which are undertaken to avoid such dangers and maintain institutional discipline).  However, violent or aggressive behavior by an inmate "increases the need for force," (Lewis, 581 F.3d at 477), and concomitantly, the absence of any immediate threat of violence must decrease the need for forceful and potentially harmful actions by correctional officials.

The Court also notes that when Pedersen entered Plaintiff's cell, he was not alone, but rather, he was accompanied by a phalanx of six other guards.  The fact that Plaintiff was significantly outnumbered does not completely eliminate the possibility that someone could have been hurt when Pedersen entered Plaintiff's cell.  There is no evidence that

17

Plaintiff was suspected of having a weapon, but it is conceivable that someone could have been injured even in a weaponless physical skirmish.   However, just as there is no evidence suggesting that Plaintiff had any weapon available to him, there is nothing in the record indicating he was preparing to fight a half dozen jail guards.   Furthermore, Plaintiff evidently knew that Pedersen was armed with a Taser, and that must have reduced Plaintiff's inclination to misbehave.   Given the magnitude of Pedersen's supporting entourage, and his possession of a Taser, drawing all inferences in favor of the non-moving party, it seems unlikely that he could have been  truly afraid that Plaintiff would hurt him or his staff when they entered the cell.

The Court has also considered the type and magnitude of the force that Pedersen used against Plaintiff.  The Taser used against Plaintiff apparently is much like the "stun gun" used in Hickey.  In that case, the Eighth Circuit found that such devices "inflict[ ] a painful and frightening blow, which temporarily paralyzes the large muscles of the body, rendering the victim helpless" and that "is exactly the sort of torment without marks with which the Supreme Court was concerned in [Hudson v. McMillian]."  Hickey, 12 F.3d at 757. Plaintiff has compared being Tasered to being struck by lightening, and Defendants have offered no reason to doubt that assertion.  Thus, the Court finds that the magnitude of the force used against Plaintiff in this case was significant.[6]

---

[6]   Pedersen contends that he should be granted summary judgment because Plaintiff "cannot produce medical records or expert reports to support his claim that he sustained any lasting injury from Pedersen's use of the Taser."  (Defendant Pedersen's Memorandum of Law in Support of Summary Judgment, [Docket No. 29], p. 17.)  Pedersen claims that Plaintiff was examined after the Tasering and he "was fine."  (Id.)   That assertion carries little weight in the present analysis.  Minimal injury is not the same as minimal force, and the primary consideration in excessive force cases is the magnitude of the force used, rather than the magnitude of the injury suffered.  As explained by the

Pedersen's subjective intent is another critical factor in the present analysis.  Indeed, Pedersen's state of mind is, by definition, the critical factor that will ultimately determine whether his use of the Taser against Plaintiff was "a good-faith effort to maintain or restore discipline," (Hudson, 503 U.S. at 7), or "an unnecessary and wanton infliction of pain," (Whitley, 475 U.S. at 319).   Plaintiff avers that before the door to his cell was opened, Pedersen had already declared that Plaintiff was going to get "zapped." (Depo. pp. 20, 22; Haggins Resp/Decl., p. 7.)  If that averment is true, as the Court must assume for summary judgment purposes, then it would appear that Pedersen had decided he was going to use the Taser on Plaintiff regardless of what Plaintiff did once the cell door was open.  Such evidence, if ultimately accepted by a trier of fact, could support a finding that Pedersen did not act in good faith.

Plaintiff further avers that sometime during the next few hours after he was Tasered, Pedersen "blew on a Taser like a smoking gun," and said "'the nigger zapper strikes again.'"  (Haggins Resp/Decl., p. 9.)  If that averment is true, and again it is assumed to be

_____

Supreme Court:

> "Injury and force... are only imperfectly correlated, and it is the latter that ultimately counts.  An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."

Wilkins v. Gaddy, 130 S.Ct. 1175, 1178-79 (2010).  For § 1983 purposes, the use of a Taser is not necessarily unconstitutional excessive force, but it must inevitably be considered more than "de minimis" force – regardless of how serious any resulting injuries might be.  (See Lewis, 581 F.3d at 475 ("the use of a Taser gun against a prisoner is more than a de minimis application of force").  This is the point made by the Eighth Circuit in Hickey, and confirmed by Gaddy.  Of course, as Gaddy also points out, if an inmate's injuries are de minimis, his recoverable damages are likely to be limited.  130 S.Ct. at 1180 ("the relatively modest nature of [the plaintiff's] alleged injuries will no doubt limit the damages he may recover").

true for purposes of a summary judgment motion, it would tend to support Plaintiff's claim that Pedersen was not acting in good faith when he fired the Taser at Plaintiff.

The Court has taken into account Pedersen's meticulous parsing of the video recording of the Taser incident.  Pedersen acknowledges that Plaintiff was starting to turn away from him, (not advancing toward him), when the Taser actually was fired.   But according to Pedersen, a careful frame-by-frame analysis of the video recording shows that he was already irreversibly committed to shooting the Taser before Plaintiff began to turn away.   (Defendant Pedersen's Reply Memorandum of Law in Support of Summary Judgment, [Docket No. 46], pp. 5-6.)  Pedersen contends that he was forced to make a split second decision in a dangerous situation, and his decision (to fire the Taser) ought not be second-guessed years later.

Plaintiff claims, however, that Pedersen had made the decision to shoot him with the Taser before entering the cell.   According to Plaintiff, Pedersen was angry with him because of his remarks to Officer Abrahamson.  Pedersen allegedly yelled, "Open Haggins' cell – he's getting fucking zapped."  The door was then opened, and Pedersen immediately fired the Taser while Plaintiff was still trying to get dressed.   The videotape does not disprove this version of the facts.  And <u>if</u> this version of the facts were to be accepted, a judge or jury <u>could</u> conclude that Pedersen acted wantonly and maliciously.[7]

---

[7] Pedersen contends that his alleged comment, ("open Haggins's cell – he's getting fucking zapped"), "is not evidence of malice."  (Defendant Pedersen's Reply Memorandum of Law in Support of Summary Judgment, p. 13.)  That argument is rejected.  Pedersen's alleged comment may not be irrefutable proof of malice, but it certainly is some evidence of malice.  Likewise, Pedersen's alleged behavior after the Tasering – i.e., imitating Dirty Harry, and declaring that 'the nigger zapper strikes again' – may not prove malice, but it does imply malice.  Of course, it remains to be seen whether a trier of fact will actually believe Plaintiff's description of Pedersen's behavior before and after the Tasering.

Pedersen cites Hunter v. Young, 238 Fed.Appx. 336 (10th Cir. 2007) (unpublished opinion), to support his motion for summary judgment, but that case is distinguishable. First, the inmate-plaintiff in Hunter had been involved in a physical altercation with multiple sheriff's deputies just before he was Tasered in his cell.  Therefore, the defendant in Hunter had a special cause for concern about the inmate's current frame of mind and violent disposition, which was not evident in the present case.  Here, the record shows that Plaintiff has an extensive history of physical violence, but there is no evidence suggesting that he was in any violent frame of mind on the date at issue when Pedersen came to his cell with the Taser.  Furthermore, it is unclear how long the inmate in Hunter defied the jailers' commands before being Tasered.  In this case, Plaintiff apparently was given only a matter of seconds (less than a minute) to comply with Pedersen's order to lie on the floor.

Most importantly, however, Hunter cites no evidence suggesting that the defendant there harbored any malice toward the inmate-plaintiff who was Tasered.  "What matters – and what will generally be the decisive factor in cases such as this – is the mindset of the individual applying the force."  Lewis, 581 F.3d at 476.  As discussed above, there is evidence in this case, which (if believed) suggests that Pedersen's use of the Taser might have been motivated by ill will, or malice, toward Plaintiff.  No such evidence is mentioned in Hunter, and that is a critical distinction.

Looking at the present record as a whole, this Court reaches the same conclusion that the Seventh Circuit reached in Lewis.  Substituting the names of our parties for the Lewis parties, this conclusion is as follows:

_____

> "[B]ased on [Plaintiff's] facts, we cannot say that [Pedersen] acted in good faith.  Nor can we say that [Pedersen] acted maliciously or wantonly.  Our only conclusion is that if we accept as true [Plaintiff's] version of the events surrounding the Taser shot, he has raised a genuine issue of material fact regarding Officer [Pedersen's] state of mind when [Pedersen] fired the Taser gun.  That is enough to preclude summary judgment.  What [Plaintiff] will be able to prove at trial is a different question altogether, but [Plaintiff] has presented enough here that if the jury accepted his story, it could find in his favor.  That is all we require."

Lewis, 581 F.3d at 478.

B.  Qualified Immunity

Defendant Pedersen has also raised a qualified immunity defense.  The Supreme Court has explained that –

> "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"

Pearson v. Callahan, 555 U.S. 223, 231 (2009), quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  A two-step process is used for resolving qualified immunity claims:

> "First, a court must decide whether the facts that a plaintiff has alleged... or shown... make out a violation of a constitutional right....  Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."

Pearson, 555 U.S. at 232 (citations omitted).

Here, the Court has found that Plaintiff's allegations and evidence do make out a violation of his constitutional rights at least sufficient to survive a motion for summary judgment.  As discussed above, the facts that Plaintiff has alleged and presented, if proven to be true at trial, could show that Defendant Pedersen violated his constitutional rights by using excessive force against him – i.e., by maliciously causing him harm.

Turning to the second step of the qualified immunity analysis, the Court also finds that the right asserted by Plaintiff was clearly established long before he was Tasered by Pedersen in August 2007.  See Hudson, 503 U.S. at 9 ("[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated").  Pedersen certainly should have known that if he maliciously used force against Plaintiff for the purpose of harming him, then he would be violating Plaintiff's constitutional rights.  The Eighth Circuit held in 1993, fourteen years before Pedersen fired a Taser at Plaintiff, that the Constitution prohibits a jail attendant from shooting an inmate with a stun gun, if such action is "taken in bad faith," or "amount[s] to a wanton infliction of pain for no legitimate reason."  Hickey, 12 F.3d at 758.  Thus, the constitutional right that Plaintiff is asserting in this case was clearly established long before Pedersen fired a Taser at Plaintiff.

Pedersen contends that he is entitled to qualified immunity, because Plaintiff "has not and cannot provide authorities showing that, on August 30, 2007, it was unconstitutional to use a Taser to get a dangerous and noncompliant pretrial detainee into handcuffs." (Defendant Pedersen's Reply Memorandum of Law in Support of Summary Judgment, [Docket No. 46], p. 16.)  This argument is unpersuasive.  Plaintiff is not required to provide legal authority to support a claim he is not making.  Plaintiff is not contending that Tasers can never be used to control dangerous detainees; he contends that jailers cannot maliciously use Tasers for the purpose of hurting detainees.

Pedersen's current qualified immunity defense must be rejected for the same reason that the Eighth Circuit Court of Appeals rejected a similar defense that Pedersen raised in Mahamed v. Anderson, 612 F.3d 1084 (8th Cir. 2010).  In that case, another inmate at the

Sherburne County Jail, named Mahamed, claimed that Pedersen violated his federal constitutional rights by shooting him with a Taser while he was confined in a cell.[8]  The trial court judge rejected Pedersen's qualified immunity defense in Mahamed, because if Mahamed's factual allegations were found to be true at trial, then Pedersen violated the well established prohibition against the use of excessive force.   Mahamed v. Anderson, Civil No. 07-4815 (ADM/FLN), (D. Minn. 2009), (Montgomery, J.), 2009 WL 873534 at *5, aff'd, 612 F.3d 1084 (8th Cir. 2010).   The Eighth Circuit upheld the trial court's ruling, pointing out that Pedersen's qualified immunity defense was based on his own description of the apposite facts, and gave little or no weight to the plaintiff's version of the facts. Mahamed, 612 F.3d at 1086 ("Pedersen's argument depends on our resolution of numerous factual issues in his favor").

The Court of Appeals' discussion of Pedersen's qualified immunity defense in Mahamed is directly applicable to the present case:

> "Many of Pedersen's factual assertions are in conflict with Mahamed's statement of the facts, which, at the summary judgment stage, we must take as true.   The factual controversies pertaining to Mahamed's conduct, Pedersen's response, Pedersen's intent, and Mahamed's injuries, are the type of issues best left for trial.... [E]ven though Pedersen seeks to frame the issue in terms of qualified immunity, he asks this court to find qualified immunity on facts contrary to those Mahamed presented to the district court. We do not have jurisdiction or the capability to decide these factual disputes."

Mahamed, 612 F.3d at 1087.  Here too, Pedersen's qualified immunity defense requires the Court to resolve disputed issues of fact in his favor.  However, as the Court of Appeals held in Mahamed, if a qualified immunity defense requires a court to resolve critical factual

---

[8]  In Mahamed, Defendant Pedersen shot a Taser at an inmate who was lying on his back on the floor of his cell.  One of the Taser probes struck the inmate's testicle.

disputes in the defendant's favor, then the qualified immunity defense cannot succeed on summary judgment.

In this case, if Plaintiff's factual allegations were to be accepted at trial, then a judge or jury could find that Pedersen acted with malice toward Plaintiff.  As previously discussed, according to Plaintiff, Pedersen angrily announced that Plaintiff was going to get "zapped;" he stormed into Plaintiff's cell with a small squadron of guards; he knew (or should have known) that Plaintiff posed no danger because he was simply getting dressed; he nevertheless immediately fired the Taser as soon as he entered Plaintiff's cell; and he later boasted about Tasering Plaintiff.  Whether Plaintiff can prove this version of the facts at trial remains to be seen.  However, based on Plaintiff's current description of Pedersen's words and deeds, a trier of fact could conclude that Pedersen did not shoot the Taser in a good faith effort to keep the Sherburne County Jail safe and secure, but rather he shot the Taser because he was angry at Plaintiff, he did not like Plaintiff, and he thought that Plaintiff should suffer for his habitual bad behavior.

The Seventh Circuit's decision in Lewis provides useful guidance on the qualified immunity issue.  Substituting the names of our parties for the Lewis parties (once again), the apposite segment of the Lewis opinion squarely fits the present case:

> "We hold that a reasonable officer would understand that employing a Taser gun under the version of the facts that [Plaintiff] has described would violate the prisoner's constitutional rights.... [¶]  If these truly are the facts, no reasonable officer would think that he would be justified in shooting [Plaintiff] with a Taser gun.  Accepting [Plaintiff's] story, we conclude that [Pedersen] is not entitled to qualified immunity.

Lewis, 581 F.3d at 479.

Thus, the Court reaches the same conclusion here that the District Court Judge

25

reached in <u>Mahamed</u>:

> "Viewing the facts in the light most favorable to [the plaintiff], he was uncooperative but not dangerous or threatening, and therefore the use of a Taser violated his clearly established constitutional right to be free from excessive force.  For this reason, summary judgment is denied on the claim of excessive force against Pedersen."

<u>Mahamed</u>, 2009 WL 873534 at *5.

### C.  <u>State Law Claim Against Defendant Pedersen</u>

Plaintiff is also attempting to bring a state law tort claim against Pedersen for

shooting him with the Taser.  Pedersen does not dispute that shooting Plaintiff with Taser

could constitute an assault or battery under Minnesota common law, but he contends that

he is immune from Plaintiff's tort claim under Minnesota's official immunity defense.

> "Minnesota state law provides that 'a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong.' <u>Elwood v. Rice Cnty.</u>, 423 N.W.2d 671, 678 (Minn. 1988) (quoting <u>Susla v. State</u>, 311 Minn. 166, 247 N.W.2d 907, 912 (1976)).

<u>Anderson v. City of Hopkins</u>, 805 F.Supp.2d 712, 723-24 (D. Minn. 2011).

> "In the official immunity context, willful and malicious are synonymous, <u>Rico v. State</u>, 472 N.W.2d 100, 107 (Minn.1991), and mean 'intentionally committing an act that the official has reason to believe is <u>legally</u> prohibited.' <u>Kelly v. City of Minneapolis</u>, 598 N.W.2d 657, 663 (Minn.1999) (citing State by <u>Beaulieu v. City of Mounds View</u>, 518 N.W.2d 567, 571 (Minn.1994) (emphasis added)).
>> 'The [malice] exception does not impose liability merely because an official intentionally commits an act that a court or a jury subsequently determines is a wrong.  Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is [legally] prohibited.'"
> <u>Rico</u>, 472 N.W.2d at 107.  The intent of official immunity is to protect honest law enforcement efforts but not 'to shield police brutality.'  <u>Elwood</u>, 423 N.W.2d at 679.  Therefore, the officers are entitled to official immunity unless the facts, in a light most favorable to [the plaintiff], demonstrate malice."

Id. at 724. Again, "[m]alice, in the official immunity context, means intentionally committing an act that the official has reason to believe is legally prohibited." Thompson v. Anoka-Hennepin East Metro Narcotics, 673 F.Supp.2d 805, 817 (D. Minn. 2009).

Pedersen contends that he is entitled to official immunity on the state law tort claim, because (1) he was acting as a public official when he fired the Taser at Plaintiff, (2) he was performing a purely discretionary duty, (rather than a ministerial duty), and (3) his actions were not willful or malicious. Although Pedersen's first two contentions are well-founded, he cannot be granted summary judgment on his official immunity defense, unless it is determined, as a matter of law, that he acted without malice when he fired the Taser at Plaintiff.

The Court has already determined, however, that Pedersen has thus far failed to establish that he did not act maliciously. Malice is the sine qua non of Plaintiff's § 1983 excessive force claim, and the Court has already found that, based on the current evidentiary record, it cannot be determined (as a matter of law) whether Pedersen acted with or without malice. In this case, Pedersen's intent and state of mind at the time of the Tasering are genuine issues of material fact that cannot be resolved on summary judgment. Therefore, Pedersen's official immunity defense cannot be upheld at this time, and Plaintiff's state law tort claim must survive Pedersen's summary judgment motion. See Anderson, 805 F.Supp.2d at 724 ("[t]he Court finds there is a genuine issue of material fact as to whether [the defendant] acted with malice, thus official immunity does not apply to [the defendant]"); Mayard v. Siegfried, No. 08-5853 (JRT/SER), (D. Minn. 2011), 2011 WL 579334 at *7 ("taking the facts in the light most favorable to [the plaintiff] a jury could reasonably conclude that [the defendant] used excessive force" in violation of the plaintiff's

27

federal constitutional rights, and "[f]or the same reasons, the jury could find [the defendant] liable for battery under Minnesota state law"); <u>Thompson</u>, 673 F.Supp.2d at 817 ("[f]or the reasons that the Court denied summary judgment on Plaintiffs' claims for excessive force under § 1983, the Court similarly concludes that summary judgment is inappropriate on Plaintiffs' assault and battery claims"); <u>Michaud v. Demarest</u>, No. 06-4362 (ADM/JSM), (D. Minn. 2008), 2008 WL 4057744 at *9 (defendants "are not entitled to official immunity because there is a genuine issue regarding whether they are 'guilty of a wilful or malicious wrong'") (citation omitted).

D. <u>State Law Claims Against Defendant Sherburne County</u>

As previously mentioned, Plaintiff has voluntarily dismissed his § 1983 "<u>Monell</u>" claims against Defendant Sherburne County, but he has indicated that he still intends to pursue a state tort law claim against the County based on respondeat superior.  Plaintiff seeks to hold the County vicariously liable for the state common law assault and battery allegedly committed against him by the County's employee, Defendant Pedersen. Sherburne County does not deny being Pedersen's employer at the time of the Tasering, nor does the County deny that Pedersen was acting within the scope of his employment when he Tasered Plaintiff.  Sherburne County's sole defense is that Pedersen himself is entitled to official immunity, and the County is therefore vicariously entitled to official immunity as well.

> "Minnesota's Tort Claims Act allows a municipality... to be held liable for the torts of its officials, subject to certain exceptions.  <u>See</u> Minn.Stat. § 466.02 (2006).  But if official immunity protects the government official from personal liability, then the municipality 'will not be liable for its employee's torts under [section 466.02] or under common law respondeat superior.'"

<u>Yang v. Nutter</u>, No. A07-232 (Minn.App. 2008), (unpublished opinion), 2008 WL 186182

at*3, quoting Watson v. Metro. Transit Comm'n, 553 N.W.2d 406, 414 (Minn. 1996). See also Whalen v. Langfellow, 731 F.Supp.2d 868, 886 (D. Minn. 2010) ("Vicarious official immunity protects a governmental entity from liability based on the acts of an employee who is entitled to official immunity....   The general rule is that a municipal employer is entitled to vicarious official immunity if the employee is found to have immunity.") (citations omitted).

Sherburne County's legal reasoning is sound, but its argument for summary judgment fails, because it is based on a false premise – i.e., that Defendant Pedersen is personally entitled to official immunity.  Because Pedersen's official immunity defense is not sustainable on summary judgment, (due to the factual issue of whether he acted with malice), the County's pendant defense must also be rejected at this stage of the proceedings. See Kelly v. City of St. Paul, No. 09-461 (JRT/JSM), (D. Minn. 2010), 2010 WL 4272460 at *10 (where question of fact precluded summary judgment on municipal employee's immunity defense, the municipal employer could not be granted summary judgment based on vicarious official immunity); Krawiecki v. Hawley, No. 08-5309 (JMR/RLE) (D. Minn. 2010), 2010 WL 3269960 at *6 (because county employee is not entitled to official immunity, the county itself "is not entitled to vicarious official immunity for plaintiff's related claims of respondeat superior"); Mann v. Shevich, No. 08-5202 (ADM/RLE), (D. Minn. 2010), 2010 WL 653867 at *8 ("[o]n the record before the Court, whether [county deputy] is entitled to official immunity – and whether [the county itself] is thereby entitled to vicarious official immunity – cannot be resolved on summary judgment").

E.  Request For Sanctions

The final matter to be considered at this time is Defendant Sherburne County's

request for an injunction that would prevent Plaintiff from filing future lawsuits without pre-authorization.[9] This request is based on Plaintiff's past record of filing numerous lawsuits. This Court is well aware of Plaintiff's substantial history as a litigator, and the Court certainly is sensitive to the burdens caused by frivolous lawsuits.   Under certain circumstances, it is undoubtedly appropriate for a federal district court to protect itself from habitually frivolous filers, by entering the type of order that Sherburne County is seeking here.   See In re Tyler, 839 F.2d 1290, 1292, 1293 (8th Cir. 1988) (a federal court "has authority to control and manage matters pending before it," and "may, in its discretion, place reasonable restrictions on any litigant who files non-meritorious actions for obviously malicious purposes and who generally abuses judicial process").   Although Plaintiff may be getting precariously close to joining our District's roster of "restricted filers," this Court is not prepared to recommend that his name should be added to that list at this time.   Given the Court's resolution of Defendants' present summary judgment motions, this is not the proper occasion to determine whether Plaintiff should be required to obtain pre-approval before filing future lawsuits.

## V. RECOMMENDATION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Defendant Stephen Pedersen's motion for summary judgment, (Docket No. 27),

---

[9]  Defendant presumably means that Plaintiff should be barred from filing more lawsuits here in the United States District Court for the District of Minnesota, unless he first submits a proposed complaint to a District Court Judge, and the Judge directs the Clerk to file the complaint.

be **DENIED**;

      2.  Defendant Sherburne County's motion for summary judgment, (Docket No. 18),

be **DENIED**;

      3.  Defendant's Sherburne County's motion to enjoin Plaintiff from filing future

lawsuits without permission, (Docket No. 18), be **DENIED**;

      4.  Plaintiff's claims against Defendant Sherburne County under 42 U.S.C. § 1983

be **DISMISSED WITH PREJUDICE**;

      5.  All of Plaintiff's claims against Defendant Sherburne County Sheriff be

**DISMISSED WITH PREJUDICE**, and Defendant Sherburne County Sheriff be dismissed

from this action.


Dated: April 16, 2012

s/Leo I. Brisbois        
LEO I. BRISBOIS
United States Magistrate Judge

## N O T I C E

      Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by April 30, 2012**, a writing that specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof.  Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.